FILED

2024 May-22  PM 03:39
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## EASTERN DIVISION

| | | |
|---|---|---|
| **DOUGLAS BORGEN,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case No.: 1:22-cv-00690-MHH** |
| | } | |
| **MARTIN O'MALLEY,** | } | |
| **COMMISSIONR OF SOCIAL** | } | |
| **SECURITY,**[1] | } | |
| | } | |
| **Defendant.** | | |

## <u>MEMORANDUM OPINION</u>

Douglas Borgen seeks judicial review of a final adverse decision of the Commissioner of Social Security.   The Commissioner denied Mr. Borgen's application for a period of disability and disability insurance benefits based on an Administrative Law Judge's finding that Mr. Borgen was not disabled.  Mr. Borgen argues that in denying his request for benefits, the Administrative Law Judge—the

---

[1] On December 20, 2023, Martin O'Malley was sworn in as Commissioner of the Social Security Administration.   Pursuant to Federal Rule of Civil Procedure 25(d), the Court substitutes Commissioner O'Malley as the defendant in this action.  *See* Fed. R. Civ. P. 25(d) (Although the public officer's "successor is automatically substituted as a party" when the predecessor no longer holds officer, the "court may order substitution at any time. . . .").

ALJ—improperly evaluated his subjective complaints of pain under the Eleventh Circuit pain standard. After careful consideration of the administrative record, for the reasons explained below, the Court remands this matter to the Commissioner for further proceedings.

## ADMINISTRATIVE PROCEEDINGS

To succeed in his administrative proceedings, Mr. Borgen had to prove that he was disabled. *Gaskin v. Comm'r of Soc. Sec.*, 533 Fed. Appx. 929, 930 (11th Cir. 2013). "A claimant is disabled if he is unable to engage in substantial gainful activity by reason of a medically-determinable impairment that can be expected to result in death or which has lasted or can be expected to last for a continuous period of at least 12 months." *Gaskin,* 533 Fed. Appx. at 930 (citing 42 U.S.C. § 423(d)(1)(A)).[2]

To determine whether a claimant has proven that he is disabled, an ALJ follows a five-step evaluation process. The ALJ considers sequentially:

> (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment [or combination of impairments] meets or equals the severity of the specified impairments in the Listing of Impairments; (4) based on a residual functional capacity ("RFC") assessment, whether the claimant can perform any of his or her past relevant work despite the impairment;

---

[2] Title II of the Social Security Act governs applications for benefits under the Social Security Administration's disability insurance program. Title XVI of the Act governs applications for Supplemental Security Income or SSI. "For all individuals applying for disability benefits under title II, and for adults applying under title XVI, the definition of disability is the same." https://www.ssa.gov/disability/professionals/bluebook/general-info.htm (last visited January 28, 2024).

and (5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's RFC, age, education, and work experience.

*Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1178 (11th Cir. 2011). "The claimant has the burden of proof with respect to the first four steps." *Wright v. Comm'r of Soc. Sec.*, 327 Fed. Appx. 135, 136-37 (11th Cir. 2009). "Under the fifth step, the burden shifts to the Commissioner to show that the claimant can perform other jobs that exist in the national economy." *Wright*, 327 Fed. Appx. at 137.

Mr. Borgen applied for disability benefits on January 26, 2018. (Doc. 11-7, p. 5). He alleged that his disability began on February 22, 2017. (Doc. 11-4, p. 3). The Social Security Commissioner initially denied Mr. Borgen's claim, and Mr. Borgen requested a hearing before an ALJ. (Doc. 11-4, p. 17; Doc 11-5, p. 13). Mr. Borgen and his attorney attended a telephone hearing before an ALJ on May 5, 2020, (Doc. 11-3, pp. 116-149); a supplemental hearing on May 19, 2021, (Doc. 11-3, pp. 71-115); and a final supplemental hearing on September 1, 2021, (Doc. 11-3, pp. 45-70).

The ALJ issued an unfavorable decision on September 28, 2021. (Doc. 11-3, pp. 14-31). On April 6, 2022, the Appeals Council declined Mr. Borgen's request for review, (Doc. 11-3, p. 2), making the Commissioner's decision final and a proper candidate for the Court's judicial review. *See* 42 U.S.C. § 405(g) and § 1383(c).

## EVIDENCE IN THE ADMINISTRATIVE RECORD

### *Mr. Borgen's Medical Records*

To support his application, Mr. Borgen submitted medical records relating to the treatment and diagnoses of cervical disc degeneration, lumbar spinal stenosis, migraines, depression, and anxiety. The Court has reviewed Mr. Borgen's complete medical history in the administrative record and summarizes the following medical records because they are most relevant to Mr. Borgen's arguments in this appeal.

Records from the Multnomah County Health Department in Oregon indicate that Mr. Borgen underwent an MRI of his lumbar spine on May 25, 2011. (Doc. 11-8, p. 96). The 2011 MRI showed that Mr. Borgen had an "[a]rea of abnormal marrow signal compatible with bone marrow edema along the anterior and inferior aspect of the L1 vertebral body" that was "compatible with a subtle compression fracture deformity." (Doc. 11-8, p. 96).[3]

In June 2015, the day after a car accident in which he was rear-ended, Mr. Borgen complained to nurse practitioner Kirsten Roberts at the Mid County Clinic in Oregon that he was "stiff and sore in his neck." (Doc. 11-10, p. 59). NP Roberts recorded that Mr. Borgen had "known neck issues" and had "pain medications at

---

[3] A vertebral compression fracture occurs "when the bony block or vertebral body in the spine collapses, which can lead to severe pain, deformity[,] and loss of height. These fractures more commonly occur in the thoracic spine (the middle portion of the spine), especially in the lower part." *See* https://www.aans.org/en/Patients/Neurosurgical-Conditions-and-Treatments/Vertebral-Compression-Fractures (last visited January 29, 2024).

home." (Doc. 11-10, p. 59). NP Roberts diagnosed neck strain and gave Mr. Borgen a Toradol injection for pain. (Doc. 11-10, p. 59).

Mr. Borgen returned to NP Roberts in July 2015 and reported that his back pain was worse a few days after his car accident. (Doc. 11-10, p. 58). Mr. Borgen reported two other instances shortly after the accident in which his "back went out." (Doc. 11-10, p. 58). Mr. Borgen was using gabapentin and Flector patches that he received from a pain clinic. (Doc. 11-10, p. 58).[4] NP Roberts noted that prior imaging reflected "[m]ulti-level disc herniations." (Doc. 11-10, p. 59). NP Roberts directed Mr. Borgen to use a combination of oxycodone (eight 15 mg tablets per day), gabapentin, ibuprofen, and diclofenac patches for pain. (Doc. 11-10, p. 59).

In August 2015, Mr. Borgen saw NP Roberts because he was struggling with cold symptoms. NP Roberts noted, among other diagnoses, that Mr. Borgen had a lumbar vertebral fracture and chronic pain syndrome. (Doc. 11-10, p. 56).[5]

Mr. Borgen saw NP Roberts on February 10, 2017 and reported that he "fell on the ice and jarred his neck." (Doc. 11-10, p. 52). Mr. Borgen stated that his back pain was worse and that he could not sleep lying down. (Doc. 11-10, p. 52). NP Roberts noted that Mr. Borgen's "head [was] leaning to the right[,] and he [was] not

---

[4] The Court has not found 2015 medical records from a pain clinic in the administrative record.

[5] Medical records from 2016 concern Mr. Borgen's complaints of fever and cough; the records do not include complaints of or treatment for neck or back issues. (Doc. 11-10, pp. 53-55).

able to fully stand straight." (Doc. 11-10, p. 52). NP Roberts's assessment included "[l]umbar disc herniation." (Doc. 11-10, p. 52). NP Roberts prescribed oxycodone for pain and cyclobenzaprine for muscle spasms and referred Mr. Borgen for an MRI for neck pain and "spondylosis." (Doc. 11-10, p. 18).[6] When Mr. Borgen had a telemedicine visit with NP Roberts on February 28, 2017, he complained of increased neck pain and limited range of motion in his right shoulder. (Doc. 11-10, p. 51). Mr. Borgen reported that no one had contacted him to schedule the MRI. (Doc. 11-10, p. 51). Mr. Borgen stated that, in the past, a doctor had recommended a cervical fusion of his "cervical spine spondylosis," but he had delayed the surgery because "he really wanted to have ROM in [his] neck." (Doc. 11-10, p. 51). NP Roberts instructed Mr. Borgen not to work until she reviewed the MRI results. (Doc. 11-10, p. 51).

On March 8, 2017, Dr. Kenneth Curtin performed a cervical spine MRI without contrast on Mr. Borgen. The medical history section of the MRI report indicates that Mr. Borgen had spondylosis, neck pain, and bilateral arm pain. (Doc. 11-11, p. 88). The MRI showed "multilevel spondylitic change" with narrowing of disc spaces between C2 and C6; mild central canal stenosis at C4-5 and C5-6, with

---

[6] "Spondylosis is an umbrella term for different forms of age-related degeneration of the spine." *See* https://www.neurosurgery.columbia.edu/patient-care/conditions/spondylosis (last visited January 23, 2024).

greater stenosis of the neural foramina; "severe narrowing of the right-sided neural foramina at C4-5 and C5-6"; and "moderate left foraminal stenosis at level C4-5." (Doc. 11-11, p. 88).[7]

At a March 10, 2017 visit, NP Roberts observed that Mr. Borgen was "struggling to move his neck and use his right arm." (Doc. 11-10, p. 51). She noted that Mr. Borgen had very limited to no range of motion in his neck. (Doc. 11-10, p. 51). NP Roberts referred Mr. Borgen for a neurosurgery consultation. (Doc. 11-10, p. 51).

Mr. Borgen saw neurosurgeon Dr. Samuel Hughes on April 3, 2017. (Doc. 11-10, pp. 4-7). Mr. Borgen reported severe left neck and left arm pain that rest

---

[7] "Cervical spinal stenosis occurs when one or more intervertebral foramina (bony openings where the spinal nerves exit the spinal canal) become narrowed within the neck. When too much narrowing leads to spinal nerve compression and/or inflammation, symptoms of pain, tingling, numbness, and/or weakness may radiate from the neck into the arm." Cervical foraminal stenosis symptoms can "vary from mild annoyance to severe or debilitating" and can include neck pain; "cervical radicular pain that is electric-like and radiates into the arm or hand"; and "cervical radiculopathy, which includes neurological deficits such as numbness, reflex problems, and/or weakness in the shoulder, arm, hand, or fingers." *See* https://www.spine-health.com/conditions/spinal-stenosis/cervical-foraminal-stenosis (last visited January 28, 2024).

Cervical spinal stenosis can cause neck pain; numbness, tingling, weakness, and clumsiness in the arm, hand, leg, or foot; and decreased function in the hands. *See* https://my.clevelandclinic.org/health/diseases/17499-spinal-stenosis (last visited January 23, 2024).

"Cervical spinal stenosis does not always cause symptoms. It is possible to have cervical foraminal narrowing that is visible on medical imaging, such as an MRI, without any associated pain or neurological deficits. The underlying factors as to why some people with cervical foraminal stenosis have symptoms and others do not is still being researched." *See* https://www.spine-health.com/conditions/spinal-stenosis/cervical-foraminal-stenosis (last visited January 28, 2024).

relieved and stress and exertion made worse.  (Doc. 11-10, p. 4).  Mr. Borgen rated his pain at 3/10, described his pain as "aching" and "uncomfortable," and stated that his pain bothered him but he could "ignore it most of the time."  (Doc. 11-10, p. 6). Dr. Hughes noted that Mr. Borgen's pain was not dermatomal" and that Mr. Borgen described "neck pain and guarding; right arm pain, non-dermatomal."  (Doc. 11-10, p. 4).[8]  Dr. Hughes indicated that in addition to neck pain, Mr. Borgen had "cold sensation in [his] right hand, associated with blanching and flushing of the skin." (Doc. 11-10, p. 4).

Dr. Hughes wrote that Mr. Borgen's MRI showed cervical spine multilevel degenerative disc disease that was worse at C4-5 and C5-6 where there were "foraminal stenoses."  (Doc. 11-10, p. 6).  On this visit, Mr. Borgen had 5/5 motor strength in all areas, intact sensation in his lumbar and cervical spine, and a normal gait.  (Doc. 11-10, p. 5).  Dr. Hughes discussed with Mr. Borgen the alternative treatments for cervical disc degeneration, including "no intervention (with perhaps the pursuit of a second opinion); change of lifestyle (if only to accommodate and adapt to symptoms); medications (if only to make symptoms tolerable); minor procedures (such as [a] steroid injection); and major surgery (such as that discussed at this appointment)."  (Doc. 11-10, pp. 5-6).  Dr. Hughes discussed with Mr. Borgen

---

[8]  Dr. Hughes noted that Mr. Borgen complained of left arm pain and indicated that Mr. Borgen's right arm pain was non-dermatomal.  The Court cannot tell whether Mr. Borgen complained to Dr. Hughes of pain in both arms or whether the record contains a mistake.

the surgical options of a "C4-5 and C5-6 anterior cervical discectomy and fusion" or a right "C4-5, C5-6 laminotomy and foraminotomy" and explained the risks of both procedures. (Doc. 11-10, pp. 5-6). Dr. Hughes discussed the "potential outcomes after surgery," including "immediate relief due to treatment of a mechanical distortion of the nerve root without injury; relief in a timeframe of weeks to months due to resolution of swelling due to minor injury to the nerve involved; relief in a timeframe of months to years due to regrowth of a nerve injured by mechanical distortion to the point that neurons need[ed] to re-extend from the point of injury where they were disrupted; and no relief whatsoever due to a nerve injury too severe for the nerve to overcome." (Doc. 11-10, p. 6). Dr. Hughes concluded: "In this case, there is no good indication for such surgeries -- as I discussed with the patient. Counseled regarding radiculopathy signs and symptoms." (Doc. 11-10, p. 6).

On April 18, 2017, Mr. Borgen returned to NP Roberts and reported that Dr. Hughes told him that "he need[ed] a full cervical spine fusion"; that the surgery might help his pain but could cause him to "lose all mobility in his neck"; and that he should "try every possible intervention prior to this surgery," including physical therapy and acupuncture. (Doc. 11-10, p. 16). NP Roberts noted that, "[g]iven the severity of Mr. Borgen's disc disease, he [could] not work any job that require[d] him to move his neck." (Doc. 11-10, p. 16). Mr. Borgen asked NP Roberts to complete a short-term disability form for LifeMap, his private insurance carrier.

(Doc. 11-10, p. 16).  Mr. Borgen was using gabapentin to treat his back.  (Doc. 11-10, p. 16).

Mr. Borgen returned to NP Roberts on May 10, 2017 and reported that he had to quit work as a heavy equipment hauler because "it was getting too painful," that he struggled with tasks he used to do like fixing his car and house projects, that it "hit him hard" that he felt like he could not contribute, and that he was "sleeping a lot and eating."  (Doc. 11-10, pp. 15, 121).  Mr. Borgen indicated that he felt depressed but did not want to take medication.  (Doc. 11-10, p. 15).  NP Roberts encouraged him to walk to help his depression.  (Doc. 11-10, p. 15).

On June 29, 2017, Dr. Hughes indicated that he could not complete the requested "Attending Physician's Statement" for Mr. Borgen's short-term disability application with LifeMap because Dr. Hughes saw Mr. Borgen only once, had not treated Mr. Borgen, was "unable to identify a surgically-amenable condition," and was "not qualified to evaluate [the] extent of [Mr. Borgen's] disability."  (Doc. 11-8, pp. 106-07).

On October 25, 2017, Mr. Borgen saw NP Roberts and complained that his pain was "getting too much," that he was dropping items because his hands were shaking, and that he had three migraines each month.  (Doc. 11-10, p. 13).  Mr. Borgen reported that he was losing function in his arm; he "was working with a chainsaw and lost total function in the arm[,] and the arm and the saw dropped and

he almost severed his leg." (Doc. 11-10, p. 13). Mr. Borgen indicated that "sometimes the arm work[ed] and then [it was] like a short circuit and los[t] function," that this problem was more frequent than before, and that he "no longer use[d] the arm or hand for holding anything." (Doc. 11-10, p. 13). NP Roberts's musculoskeletal exam showed that Mr. Borgen had "some movement in the left arm/hand" and that his hand grasps were "weaker." (Doc. 11-10, p. 13). Mr. Borgen indicated that he was "ready to consider surgery but his insurance termed," and he could not afford private insurance. (Doc. 11-10, p. 13). NP Roberts noted that Mr. Borgen had pain in his "left upper extremity," that he was rapidly "losing function," and that his "best option [was] for fusion." (Doc. 11-10, p. 13). She recommended that Mr. Borgen apply for disability so that he could have insurance for the surgery. (Doc. 11-10, p. 13). She prescribed oxycodone, gabapentin, and diclofenac patches for pain. (Doc. 10-8, p. 105).

Community health nurse Jeanine Carr noted on September 12, 2018 that Mr. Borgen received pain management for "chronic pain syndrome" in 2018. (Doc. 11-10, p. 106). Mr. Borgen saw NP Roberts on November 9, 2018 and complained of migraines and neck pain. (Doc. 11-10, pp. 116-17). NP Roberts noted that Mr. Borgen's migraines had become more frequent and severe over several months and indicated that Mr. Borgen saw bright lights before a migraine began and needed to lie down in a dark room until a migraine resolved. (Doc. 11-10, p. 116). Mr. Borgen

indicated that his neck pain had become worse and "made activity nearly impossible." (Doc. 11-10, p. 117). NP Roberts indicated that Mr. Borgen was experiencing more frequent bouts of anxiety. (Doc. 11-10, p. 116). NP Roberts wrote that Mr. Borgen no longer could address his anxiety with yard work or exercise because his neck pain "made activity nearly impossible." (Doc. 11-10, pp. 116-17). NP Roberts diagnosed Mr. Borgen with "[i]ntractable migraine with aura without status migrainosus" and prescribed Imitrex. (Doc. 11-10, p. 117).

On January 24, 2019, NP Roberts completed an "Attending Physician's Statement" for Mr. Borgen's short-term disability application with LifeMap. (Doc. 11-8, p. 89). NP Roberts described Mr. Borgen's diagnosis as cervical disc degeneration and indicated that he had decreased function and mobility in his neck and right arm and hand. (Doc. 11-8, p. 89). NP Roberts stated that Mr. Borgen used pain medication and muscle relaxers as needed. (Doc. 11-8, p. 89). She indicated that Mr. Borgen could not "use the right arm/neck/hand/finger," was limited to sedentary activity, could not work, and was not expected to improve significantly in the future. (Doc. 11-8, pp. 89-90). NP Roberts noted that the "only possible surgical intervention [was] total cervical fusion" that would "prevent any movement in his neck" and might not "improve function in the right arm." (Doc. 11-8, p. 90).

Mr. Borgen returned to NP Roberts on March 19, 2019 and rated his neck pain at 5/10. (Doc. 11-10, p. 118). NP Roberts discussed with Mr. Borgen "the possibility

of weaning down" his opiate usage and noted that he was stable on his dose of opiates. (Doc. 11-10, p. 118). NP Roberts indicated that Mr. Borgen "opted to postpone the surgery as long as possible." (Doc. 11-10, p. 118).

Because NP Roberts left the Mid County Clinic, Mr. Borgen began seeing Dr. Deane de Fontes at the clinic. (Doc. 11-8, p. 87; Doc. 11-10, p. 118). On July 23, 2019, Mr. Borgen saw Dr. de Fontes for pain medication management and reported a pain level at 4/10. (Doc. 11-10, p. 119). Dr. de Fontes noted that Mr. Borgen had "lived with chronic, limiting neck pain for many years," did not have health insurance, and was "waiting to reach the age where insurance [would] assist with management/possible surgery . . . ." (Doc. 11-10, p. 119). Dr. de Fontes noted that Mr. Borgen was positive for neck pain but had normal range of motion in his neck. (Doc. 11-10, p. 119). Dr. de Fontes's assessment included lumbar disc herniation and chronic pain syndrome; he prescribed oxycodone, gabapentin, and cyclobenzaprine. (Doc. 11-10, p. 120).

Mr. Borgen returned to Dr. de Fontes on November 18, 2019 and complained of muscle spasms in his neck and frequent migraines. (Doc. 11-10, p. 121). Mr. Borgen indicated that when he had a muscle spasm, he "locked up" for about 10 minutes; his arms and shoulders felt heavy; his right arm and hand, and sometimes his left, would go numb; and he often dropped objects. (Doc. 11-10, p. 121). Mr. Borgen indicated that his migraines involved light and noise sensitivity, nausea,

vomiting, and pounding pain; that he needed to lie alone in the dark until the migraine subsided; that he took Excedrin three times a week for his migraines; that about half of his headaches turned into migraines; and that occasionally his migraines "knocked [him] for a loop" and made him bedbound.  (Doc. 11-10, p. 121).  Dr. de Fontes's physical examination showed a limited range of motion in Mr. Borgen's neck, and the diagnoses included cervical disc degeneration and chronic pain syndrome.  (Doc. 11-10, p. 122).

At the request of Mr. Borgen's attorney, Dr. de Fontes completed a "Summary Impairment Questionnaire" on November 20, 2019.  (Doc. 11-10, pp. 111-112).  Dr. de Fontes listed Mr. Borgen's diagnosis as "significant" cervical disc degeneration worse at C5-6 "where he ha[d] marked foraminal stenosis" and noted that he based the diagnosis on Mr. Borgen's MRI scans and the neurosurgical consultation.  (Doc. 11-10, p. 111).  Dr. de Fontes described Mr. Borgen's symptoms as persistent pain in his neck and shoulders, weakness in his arms and hands with greater weakness on his right side, and rigid muscle spasms.  (Doc. 11-10, p. 111).  Dr. de Fontes opined that Mr. Borgen could sit, stand, and walk for one hour in an "8-hour workday"; occasionally could lift and carry up to 10 pounds; never or rarely could lift or carry more than 10 pounds; occasionally could grasp, turn, and twist objects with his right or left hand; never or rarely could use his right or left hand for fine manipulation or to reach overhead; and would be absent from work more than three times a month

because of his impairments.  (Doc. 11-10, p. 112).  Dr. de Fontes indicated that these limitations dated to October 2017.  (Doc. 11-10, p. 112).

During a February 3, 2020 visit, Dr. de Fontes noted that Mr. Borgen was in mild distress, had a slow gait, leaned forward when he walked, and had "radicular episodes," lower back pain, and "occ. headaches."  (Doc. 11-10, pp. 132-33).  Mr. Borgen rated his pain 6/10.  (Doc. 11-10, p. 133).  Dr. de Fontes noted that because of Mr. Borgen's many years on medicine therapy for his chronic pain, Mr. Borgen likely would "experience pain for [the] remainder of his life" and the goal was "better function, less risk for permanent disability/paralysis[,] and reduced medication dependence."  (Doc. 11-10, p. 132).  Dr. de Fontes encouraged Mr. Borgen to move toward a goal of reducing his opioid usage, and Dr. de Fontes indicated that he would "decrease by half tab/day" Mr. Borgen's pain medication for the next refill.  (Doc. 11-10, pp. 132-33).  Dr. de Fontes urged Mr. Borgen "to contact Social Security office to assess if he [was] Medicare eligible due to his disability formally lasting now > 2 years."  (Doc. 11-10, p. 132).

On February 3, 2020, Dr. de Fontes completed an "Attending Physician's Statement" for Mr. Borgen's disability application with LifeMap.  (Doc. 11-11, p. 142).  Dr. de Fontes indicated that Mr. Borgen had cervical disc degeneration and spinal stenosis which caused decreased neck mobility and bilateral radiculopathy.  (Doc. 11-11, p. 142).  Dr. de Fontes opined that Mr. Borgen should avoid rapid neck

movements, could not use his arms or hands to lift more than 10 pounds, could not perform repetitive actions, and could perform only sedentary activity. (Doc. 11-11, pp. 142-43). Dr. de Fontes stated that Mr. Borgen "require[d] neck/cervical fusion per specialty consultant," that surgery would "restrict mobility and use of his upper extremities," that surgery would likely "decrease radicular symptoms but not pain or function/mobility," and that he was "unable to work at [the] time" because of his limitations. (Doc. 11-11, p. 143).

Mr. Borgen returned to Dr. de Fontes on April 5, 2021 and rated his back pain at 5/10. (Doc. 11-11, p. 150). Mr. Borgen stated he was moving south with his wife and that the slow process of packing had not significantly exacerbated his symptoms. (Doc. 11-11, p. 150). Dr. de Fontes noted that Mr. Borgen's last neurosurgery consultation was in April 2017, that the surgeon "had extensive discussion [with Mr. Borgen] regarding the nature of any surgery that they might pursue," that "at that time [the surgeon] did not think surgery was indicated," and that the surgeon "believed that [Mr. Borgen's] pain symptoms were possibly more related to left arm pathology and/or guarding." (Doc. 11-11, p. 150). Dr. de Fontes noted that NP Roberts "had made referrals to physical therapy" and that Mr. Borgen "had attended [physical therapy] without significant reduction in overall symptoms or level of function." (Doc. 11-11, p. 150). Dr. de Fontes listed Mr. Borgen's other "chronic medical conditions" as "lumbar spine stenosis and periodic flares of low back pain

and his chronic opioid use (prescribed medication use)."  (Doc. 11-11, p. 150).  Dr. de Fontes noted that Mr. Borgen had reduced his daily oxycodone usage from eight to six one-half tablets, that reduction made it challenging for Mr. Borgen "to manage" with "lesser medication," and that Mr. Borgen had no history of overuse or misuse of oxycodone.  (Doc. 11-11, p. 152).

On April 6, 2021, Dr. de Fontes completed another "Attending Physician's Statement" for Mr. Borgen's disability claim with LifeMap.  (Doc. 11-11, p. 144). Dr. de Fontes stated that Mr. Borgen's primary impairing conditions was cervical disc degeneration with cervical radiculopathy and that generalized anxiety and lumbar spondylosis also impacted Mr. Borgen's functioning.  (Doc. 11-11, p. 144). Dr. de Fontes indicated that in an eight-hour work-day, Mr. Borgen occasionally could sit, stand, and walk; occasionally lift and carry less than 15 pounds; occasionally reach above his shoulder and at desk level with his right and left arms; frequently could reach below his shoulder and use his right and left hands; and continuously could use his right and left fingers.  (Doc. 11-11, p. 144).  Dr. de Fontes opined that Mr. Borgen could not work a full- or part-time job because of pain that caused "shooting numbness and loss of strength" in his upper extremities, primarily his left arm, and because his lumbar spine caused symptoms if he leaned or bent over repetitively.  (Doc. 11-11, p. 144).  Dr. de Fontes described Mr. Borgen's limitation

as "permanent" and stated that she did not "expect any significant improvement in the future." (Doc. 11-11, p. 145).

On May 13, 2021, after Mr. Borgen moved to Alabama, he saw Dr. Davisson Edmond at Family Health and Wellness Center in Oxford to establish care. (Doc. 11-12, p. 2). Dr. Davisson's assessments included chronic pain syndrome and "other polyosteoarthritis." (Doc. 11-12, p. 3). Dr. Davisson referred Mr. Borgen to pain management. (Doc. 11-12, p. 3).

Mr. Borgen saw Dr. John Kasper at Alabama Anesthesiology & Pain Consultants in Anniston on June 17, 2021 to establish pain management care. (Doc. 11-12, pp. 41, 45-46).[9] Mr. Borgen complained of constant pain in his neck, arms, and lower back. (Doc. 11-12, p. 41). He described his pain as "aching, hot-burning, numbing, pins and needle[,] and stabbing." (Doc. 11-12, p. 41). He rated his pain at 8/10 at worse, 3/10 at best, 4/10 on average, and 5/10 at that visit. (Doc. 11-12, p. 41). Mr. Borgen reported that he had headaches; "loss in physical strength"; numbness; "leg pain while walking"; muscle pain, cramps, twitches, weakness, and tenderness; neck and back pain; and joint stiffness, swelling, and limitation in movement. (Doc. 11-12, p. 42). Mr. Borgen reported that activity, lying flat, lifting, moving, turning, working, and driving made his pain worse and that applying heat,

---

[9] The ALJ mistakenly stated that Mr. Borgen saw Dr. Gilliland at the June 17, 2021 visit. (*See* Doc. 11-3, p. 23).

taking medications, and resting helped his pain.  (Doc. 11-12, p. 41).  Mr. Borgen stated that he had physical therapy in Oregon in 2017 and a previous pain block that provided no relief.  (Doc. 11-12, p. 42).  Dr. Kasper noted that Mr. Borgen had "been told that he need[ed] a 'full' fusion."  (Doc. 11-12, p. 42).

Dr. Kasper noted that Mr. Borgen's pain was "well controlled" with oxycodone, cyclobenzaprine, gabapentin, and anti-inflammatories.  (Doc. 11-12, p. 45).  Dr. Kasper's physical examination of Mr. Borgen showed that his cervical spine had tenderness on palpation, pain with flexion anteriorly, but no pain with lateral flexion, rotation, or extension; that his thoracic spine had no tenderness to palpation, normal range of motion with flexion and extension, and had evidence of crepitation, laxity, and instability; that his lumbar spine had pain over the lumbar discs on palpation, full range of motion, and no pain with flexion or extension.  (Doc. 11-12, p. 43).  Mr. Borgen had numbness in both hands and pain on palpation in his right elbow.  (Doc. 11-12, p. 44).  Dr. Kasper noted normal range of motion in Mr. Borgen's extremities and joints; normal sensation in his arms, wrists, and fingers; and 5/5 motor strength in all extremities.  (Doc. 11-12, p. 44).  Dr. Kasper's diagnoses included cervical degenerative disc disease, bilateral arm pain, chronic low back pain, and chronic pain syndrome.  (Doc. 11-12, p. 45).  Dr. Kasper added a prescription for oxycontin 30 mg extended release twice a day and instructed Mr. Borgen to take the oxycodone for "breakthrough" pain.  (Doc. 11-12, p. 45).

On July 13, 2021, Mr. Borgen saw Dr. Corey Gilliland at the pain management clinic and complained of headaches; muscle pains and cramps; and constant pain in his back, neck, muscles, and arms. (Doc. 11-12, pp. 36-37). Mr. Borgen rated his pain at a 10/10 without medications and indicated that his medications relieved his pain by 40 percent. (Doc. 11-12, p. 36). He denied side effects from his medications. (Doc. 11-2, p. 36). Dr. Gilliland's diagnoses included cervical degenerative disc disease, bilateral arm pain, chronic lower back pain, and chronic pain syndrome. (Doc. 11-12, p. 38). Dr. Gilliland continued Mr. Borgen on his prescribed medications. (Doc.11-12, p. 39). On August 10, 2021, Mr. Borgen returned to Dr. Gilliland with similar complaints and physical examination findings as the previous visit. (Doc. 11-12, pp. 28-31).

### Dr. Kim Webster's Consultative Examination

On August 13, 2018, at the request of the Social Security Administration, Dr. Webster reviewed Mr. Borgen's medical records from 2015 and 2017 and examined him. (Doc. 11-4, pp. 3-4; Doc. 11-10, p. 95). Mr. Borgen reported that he suffered from migraines, neck pain, bilateral shoulder pain, numbness and tingling in his hands, and midthoracic pain. (Doc. 11-10, p. 95). He stated that he had three to seven migraines each week, that he had "visual scotoma" before the migraines and nausea after them, and that Imitrex did not help but Toradol did. (Doc. 11-10, p. 96). Mr. Borgen reported that his neck pain began after a "neck fracture at age 20," that

he had "injections into the neck" which helped for three weeks, that he had an "ablation of nerves" that did not help, and that physical therapy increased his range of motion but did not help with pain. (Doc. 11-10, p. 96). Mr. Borgen stated that he "had a compound fracture of the midthoracic vertebrae" and had muscle cramps. (Doc. 11-10, p. 96). Mr. Borgen indicated that he spent a "fair amount of time in bed," watched television, rarely shopped, sometimes watched his grandchildren, played with his dogs, did some drawing, and did not cook, clean, or do laundry. (Doc. 11-10, p. 96). He reported that he could sit and stand "one to two minutes," could walk two blocks, and could lift five pounds. (Doc. 11-10, p. 96).

Dr. Webster observed that Mr. Borgen moved around easily and did not have difficulty getting on and off the table or going from a supine to seated position or the reverse. (Doc. 11-10, p. 97). Dr. Webster noted that Mr. Borgen had difficulty balancing on his left leg and had difficulty walking heel to toe. (Doc. 11-10, p. 98). Dr. Webster's physical examination showed reduced range of motion in Mr. Borgen's lumbar and cervical spine but full range of motion in his shoulders; decreased pinprick throughout his "whole body except for the flexor portion of the forearms"; no pain to palpation in "any of the structures of the cervical spine," trapezius muscles, midthoracic spine, elbows, or biceps; a negative straight leg raising test; normal grasping and normal gross and fine motor skills; 5/5 strength in the upper and lower extremities; and normal deep tendon reflexes. (Doc. 11-10, pp. 98-99).

Dr. Webster noted that Mr. Borgen demonstrated "no poor effort, inconsistencies, or pain behavior," (Doc. 11-10, p. 97), and his "[s]ubjective report" was consistent with her objective findings.  (Doc. 11-10, p. 98).

Dr. Webster opined that there was no objective evidence to support Mr. Borgen's need for an assistive device; for a standing, walking, sitting, pulling, lifting, or carrying limitation; or for manipulative restrictions.  (Doc. 11-10, p. 100).  Dr. Webster opined that Mr. Borgen could not climb, crawl, or stoop and stated that "these activities would cause accentuated extension or flexion in his neck and it [did] sound like in reading the old records that he [did] have some significant neck problems on x-rays and MRIs.  It just did not show up on any exam today."  (Doc. 11-10, p. 100).

### *Dr. Thomas Davenport's Consultative Examination*

On August 20, 2018, at the request of the Social Security Administration, Dr. Davenport reviewed Mr. Borgen's medical records and assessed his physical functional capacity from February 23, 2017 through the date of his assessment.  (Doc. 11-4, pp. 12-13).  Dr. Davenport opined that Mr. Borgen occasionally could lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; could stand, sit, and walk about six hours in an eight-hour workday; occasionally could push and pull with the upper extremities; occasionally could crouch and crawl; occasionally could

reach overhead bilaterally; could climb ramps and stairs, balance, stoop, and kneel without limitations.  (Doc. 11-4, pp. 12-13).

Dr. Davenport indicated that Dr. Webster's medical opinion was "an underestimate of [Mr. Borgen's] restrictions/limitations."  (Doc. 11-4, p. 15).  Dr. Davenport noted that NP Roberts's opinion was more restrictive than Dr. Davenport's findings because NP Roberts relied "heavily on the subjective report of symptoms and limitations provided by [Mr. Borgen], and the totality of the evidence [did] not support the opinion . . . which render[ed] it less persuasive."  (Doc. 11-4, pp. 15-16).  Dr. Davenport stated that Mr. Borgen was approaching advanced age and had limited education, but he could adjust to other unskilled work at the light exertional level.  (Doc. 11-4, pp. 16-17).

### *Dr. William Nisbet's Consultative Examination*

On October 19, 2018, at the request of the Social Security Administration, Dr. Nisbet reviewed Mr. Borgen's medical records and assessed his physical residual functional capacity from February 23, 2017 through the date of the assessment. (Doc. 11-4, p. 29).  Dr. Nisbet's opinion mirrored that of Dr. Davenport.  (Doc. 11-4, pp. 29-31, 33-35).

*Mr. Borgen's Function Report*

On March 29, 2018, at the request of the Social Security Administration, Mr. Borgen completed an adult function report.  (Doc. 11-8, p. 28).[10]  Mr. Borgen indicated that his impairments affected his ability to work, lift, squat, bend, reach, walk, sit, kneel, climb stairs, complete tasks, concentrate, follow instructions, and use his hands.  (Doc. 11-8, p. 33).  He stated that he could not grasp things "without dropping them sometimes," that his neck locked up sometimes when he grabbed something as little as one pound, and that his migraines required him to stay in dark rooms sometimes for two to three days.  (Doc. 11-8, p. 28).  He indicated that he could not focus or complete a thought because of his pain, that his pain caused him to sleep in a chair and kept him up at night, and that gabapentin and his muscle relaxer made him sleepy.  (Doc. 11-8, pp. 28-29, 34).

Mr. Borgen explained that on a typical day from the time he woke up until he went to bed, he took his medications, drank coffee, went back to sleep, ate, fed his pet with his wife's help, and watched television.  (Doc. 11-8, p. 29).  He stated that he could not button a shirt or pants because he could not grasp the button, his wife washed his hair on "bad days" when he could not lift his arms above his head, and that he could not wipe properly on some days after using the toilet.  (Doc. 11-8, p. 30).  Mr. Borgen indicated that he could shop in stores for about an hour on a regular

---

[10]  Ms. Borgen completed the function report on Mr. Borgen's behalf.  (Doc. 11-8, p. 35).

basis, prepare frozen meals, fold clothes, and wipe countertops, but his wife did the housework.  (Doc. 11-8, pp. 30-31).  Mr. Borgen reported that he could not fish or woodwork anymore because of his limitations, that he did not use tools that could hurt him because he might drop them, and that he did not drive because his "neck [would not] allow [him] to dive safely and [his] arm [could] just let go of [the] steering wheel."  (Doc. 11-8, pp. 31-32).

### Mrs. Borgen's Third-Party Function Report

On April 30, 2018, Teresa Borgen, Mr. Borgen's wife, completed an adult third-party function report.  (Doc. 11-8, p. 38).  Mrs. Borgen reported that Mr. Borgen had the limitations included in Mr. Borgen's function report.  (Doc. 11-8, pp. 43-44).  She stated that Mr. Borgen helped feed the pets, but she had to cut open bags of food and lift the food bag if it was mostly full.  (Doc. 11-8, p. 39).  Mrs. Borgen indicated that she washed Mr. Borgen's hair when he could not lift his arms above his head without experiencing pain, that she sometimes helped him out of bed because his arms would not work, and that he did not wear buttoned shirts because he could not button them.  (Doc. 11-8, p. 39).  She reported that Mr. Borgen sometimes helped with chores by dusting and sweeping, but he could not bend down to put the dust in the dustpan; that he shopped twice a month for food for an "average" amount of time; and that he could not drive because of his medications,

his inability to turn his head without pain, and his fear that his hands would quit working while driving.  (Doc. 11-8, pp. 40-41).

Ms. Borgen stated that her husband acted "ok in front of people . . . but at the end of the day or away from people[,] he [was] in so much pain he [was] almost crying"; he had "deep fears" that the cervical neck surgery would cripple him and be "life ending."  (Doc. 11-8, p. 45).

### *Mr. Borgen's First Administrative Hearing*

Mr. Borgen attended his first administrative hearing on May 5, 2020.  He reported that he was 53 years old, had completed the eleventh grade, and had not obtained a GED.  (Doc. 11-3, p. 122).  Mr. Borgen stated that he was married and had adult children.  (Doc. 11-3, pp. 137-38).  He had not worked since February 2017.  (Doc. 11-3, p. 123).  Mr. Borgen testified that he did not have insurance but received treatment at a "county clinic" and had long-term disability insurance coverage.  (Doc. 11-3, p. 139).

Mr. Borgen stated that he no longer had a CDL because he did not pass his DOT physical to drive a commercial truck, he could not drive a truck while he was taking oxycodone for pain, and he did not have a regular driver's license because he thought it was too dangerous because of issues with his arms and muscle spasms.

(Doc. 11-3, pp. 139-40, 142).[11]  He also stated that the Flexeril and Gabapentin that he took multiple times each day caused severe drowsiness.  (Doc. 11-3, p. 140).  Mr. Borgen testified that he could not work because of his "neck, low back, arms, just day-to-day pain mediation, but mainly because of [his] neck and [his] arms in severe pain."  (Doc. 11-3, p. 140).  Mr. Borgen testified that he avoided lifting anything especially above his head because the neuropathy in his arms caused him to drop "a lot of stuff," stuff like coffee cups and plates.  (Doc. 11-3, pp. 142-43).

Mr. Borgen testified that he helped his wife fold clothes occasionally, cleaned the bathroom sink, and occasionally grocery shopped with his wife.  (Doc 11-3, pp. 142-43).  Mr. Borgen indicated that his son mowed the grass, and his wife vacuumed.  (Doc. 11-3, p. 142).  Mr. Borgen stated that due to his impairments, he did not have hobbies, so he spent his time talking to his wife, watching TV, and talking to his grandkids.  (Doc. 11-3, p. 144).

Lisa Broten testified as a vocational expert at Mr. Borgen's first administrative hearing.  (Doc 11-3, p. 122).[12]  Ms. Broten classified Mr. Borgen's past work as a truck driver as semi-skilled, medium work with an SVP of four but performed at the

---

[11] Mr. Borgen stated that while he was driving trucks, he tried not to take oxycodone during the day.  (Doc. 11-3, p. 142).

[12]  The transcript from the May 5, 2020 administrative hearing identified Ms. Broten as "Lisa Brottan."  (Doc. 11-3, p. 117; Doc. 11-8, p. 158).  The transcript for the September 1, 2021 hearing identified Ms. Broten as "Elizabeth Broten."  (Doc. 11-3, p. 45).  The second spelling appears to be correct.

heavy exertional level.  (Doc 11-3, pp. 125-26, 130).  The ALJ asked Ms. Broten to assume a hypothetical individual with the same age, education, and work experience as Mr. Borgen who was limited to light work with the following limitations:

> [T]he individual [could] never climb ladders, ropes, and scaffolds[;] [could] occasionally crouch and crawl[;] [could] occasionally push and pull with the bilateral upper extremities[;] [could] occasionally reach with the bilateral upper extremities[;] [could] understand [and] remember simple as well as some detailed instructions[;] and ha[d] sufficient concentration, persistence, and pace to complete simple as well as detailed tasks up to SVP 4.

(Doc. 11-3, pp. 130-31).  Ms. Broten testified that the individual could not perform Mr. Borgen's past work as a truck driver but could perform light work with an SVP of two as a furniture rental clerk with 60,302 available jobs nationally and as a counter clerk with 3,840 available jobs nationally.

In the ALJ's second hypothetical, she asked Ms. Broten to add to the first hypothetical that the individual occasionally could handle, finger, and feel with the right upper extremity.  (Doc. 11-3, p. 132-33).  Ms. Broten concluded that an individual with those limitations could not perform Mr. Borgen's past work but could perform the furniture rental clerk and counter clerk jobs from the first hypothetical. (Doc. 11-3, p. 133).

The ALJ asked Ms. Broten to assume a third hypothetical that included the limitations in the first hypothetical with the individual limited to sedentary work. (Doc. 11-3, p. 133).  Ms. Broten testified that an individual with those limitations

could perform sedentary work as an election clerk with 10,387 available jobs nationally and as a call out operator, also known as a credit account checker, with 3,336 available jobs nationally.  (Doc. 11-3, pp. 133-34).

Finally, the ALJ asked Ms. Broten to assume the limitations from the first hypothetical but add the limitation that the individual occasionally could "flex and extend the neck backward and forward and side-to-side" and "occasionally rotate the head to either side."  (Doc. 11-3, p. 134).  Ms. Broten testified that the hypothetical individual could perform the four jobs she listed for the previous hypotheticals but with a 50 percent reduction in the number of available jobs.  (Doc. 11-3, pp. 135-36).  Ms. Broten testified that the individual also could work as an usher, classified as light work with an SVP of two, but the available jobs of 4,460 would be reduced by 50 percent.  (Doc. 11-3, pp. 136-37).  Ms. Broten testified that an individual who was "absent two or more days a month on a regular basis" could not "maintain competitive employment."  (Doc. 11-3, p. 145).

### Second Administrative Hearing

On May 19, 2021, the ALJ held a telephone hearing to obtain testimony from Dr. James Haynes, a medical expert and board-certified neurologist.  (Doc. 11-3, p. 73).  Dr. Haynes stated that he had "read the file regarding [Mr. Borgen's] medical condition" and that the record contained sufficient evidence to allow him to "form a medical opinion about the nature and severity of [Mr. Borgen's] impairments."

(Doc. 11-3, p. 78).  Dr. Haynes described Mr. Borgen's impairments as arthritic changes in his neck, cervical narrowing at two levels, chronic neck pain, and left arm pain.  (Doc. 11-3, pp. 78-79).

Dr. Haynes discussed the objective findings in Mr. Borgen's medical record, including an MRI that showed severe right and moderate left foramina narrowing at C4-5.  (Doc. 11-3, pp. 98-99).  Dr. Haynes stated that foramina narrowing was a "very common finding in asymptomatic patients," so he could not say that the finding "mean[t] something."  (Doc. 11-3, p. 97).  He explained that the finding of severe right foramina narrowing did not "necessarily have any impact on anything." (Doc. 11-3, p. 84).  Dr. Haynes noted that the narrowing was worse on the side opposite the side on which Mr. Borgen was having symptoms and stated that he thought the narrowing was "not a very big issue."  (Doc. 11-3, p. 84).  Dr. Haynes stated that Mr. Borgen had "normal imaging" and did not have "physical abnormalities that correlate[d] with his symptoms."  (Doc. 11-3, p. 93).  Dr. Haynes stated that it was his "observation" that he was not "supposed to rely on pain alone" and needed "objective findings."  (Doc. 11-3, p. 93).

Dr. Haynes also noted Dr. Hughes's opinion that Mr. Borgen's pain was non-dermatomal, and Dr. Haynes explained the difference between dermatomal and non-dermatomal pain.  (Doc. 11-3, p. 79).  He described dermatomal pain in terms of the "human body striped like a zebra, except you [could not] see the stripes.  Each stripe

would be a dermatome" that connects to a nerve root.  (Doc. 11-3, pp. 79-80).  Dr. Haynes explained that if a nerve root was damaged, "you would expect to have whatever combination of weakness or reflex abnormality or a sensory abnormality in the distribution of that nerve root."  (Doc. 11-3, p. 80).  He stated that non-dermatomal pain was "all over" and did not match up with specific nerve roots. (Doc. 11-3, p. 80).  Dr. Haynes testified that there was no specific cause for non-dermatomal pain and that it was subjective with no objective evidence.  (Doc. 11-3, p. 80).  Regarding non-dermatomal pain, Dr. Haynes stated:  "[I]t [might] be that it radiate[d] out some way in an unphysiologic manner from . . . whatever is going on in the spine or it might be a condition out in the extremity.  It could be a vascular blood vessel[,] . . . a venous thrombosis[,] . . . [or] a tumor somewhere.  There [were] lots of possibilities."  (Doc. 11-3, p. 80).

Mr. Borgen's attorney asked Dr. Haynes if Mr. Borgen had "pain complaints that match[ed] up with dermatomal pain at the C4-5 level," where he had severe narrowing.  (Doc. 11-3, p. 99).  Dr. Haynes responded that Dr. Hughes was "smart enough to look at the MRI and say maybe we'd better look here and look there . . . and that [was] what [Dr. Hughes] did.  He measured strength[,] . . . reflexes[,] [and] . . . sensation.  [Dr. Hughes] [d]id not see anything that was correlating.  And ditto with Dr. Webster."  (Doc. 11-3, pp. 99-100).

Dr. Haynes opined that Mr. Borgen's chronic pain and polypharmacy were the main issues, that Mr. Borgen's oxycodone dosage was "really, really high," and that the oxycodone, a muscle relaxer, and gabapentin were "just a lot of medication." (Doc 11-3, p. 79).  Dr. Haynes stated that "if an average person took that ['huge amount of pills'] in a day[, he] could possibly die," that the amount and combination of medication Mr. Borgen was taking "might make him a hazard," and that Mr. Borgen should not be driving a car.  (Doc. 11-3, pp. 81, 84, 91).  Dr. Haynes acknowledged that level of medications could affect Mr. Borgen's ability to stay on task, concentrate, and focus maybe "5 or 10%" of the time and that he should not drive while taking those medications.  (Doc. 11-3, p. 84).  Dr. Haynes testified it was difficult to know the degree to which the side effects from taking so much medication might limit Mr. Borgen's functional ability because he might have developed a drug tolerance from long-term use of opioids.  (Doc. 11-3, p. 90).  Dr. Haynes stated that activity could distract Mr. Borgen from his pain – "That's just human experience." (Doc. 11-3, p. 92).

Dr. Haynes took into consideration the findings of Dr. Hughes, Dr. Webster, and NP Roberts.  Dr. Haynes noted that Dr. Hughes conducted a "good neurological evaluation" of Mr. Borgen and stated that Dr. Hughes "very wisely said that there was no surgical remedy."  (Doc. 11-3, p. 79).  Dr. Haynes acknowledged Dr. Webster's August 2018 opinion and agreed with Dr. Webster's conclusion that "there

was no basis to impose limitations" for Mr. Borgen.  (Doc. 11-3, p. 79).  In discounting NP Roberts's opinion, Dr. Haynes noted that her opinion had been "superseded by the very careful evaluation from Dr. Hughes, a board specialized, board-certified neurosurgeon." (Doc. 11-3, p. 86).

Dr. Haynes testified that Mr. Borgen did not meet listing 1.15, which required "neuroanatomic combinations of pain." (Doc 11-3, p. 79).  Dr. Haynes noted that Dr. Hughes's and Dr. Webster's examinations showed that Mr. Borgen had "reasonable" strength and that because of his strength, Mr. Borgen "could do whatever he wanted to do . . . without fear of damage or hurting himself." (Doc. 11-3, p. 88).  Dr. Haynes opined that Mr. Borgen could push 20 pounds "without fear of damage or hurting himself." (Doc. 11-3, p. 88).  Dr. Haynes opined that because of Mr. Borgen's "arthritic changes and chronic pain," Mr. Borgen could do "overhead work" "15 to 17%" of the time; could not drive; should avoid hazards, heights, ladders, and moving machinery like power tools; could crouch, crawl, and push and pull with the upper extremities with no limitations; and occasionally could flex, extend, and rotate his neck backward and forward and side to side.  (Doc. 11-3, pp. 81-84).

Mr. Borgen testified that he continued to suffer from migraine headaches three or four times a week that lasted between an hour-and-a-half to five hours.  (Doc. 11-3, p. 105).  Regarding his neck pain, he indicated that he experienced pain mainly in

his shoulders and arms; he also stated that he had pain in his left leg and foot and lower back.  (Doc. 11-3, p. 106).  Mr. Borgen testified that he continued to have side effects from his medications, including drowsiness, irritability, aggression, and nausea.  (Doc. 11-3, p. 106).  Mr. Borgen testified that he had problems with his hands and fingers turning white; he stated that a doctor diagnosed him with Raynaud's syndrome.  (Doc. 11-3, p. 107).[13]  He testified that about six to seven times a week he would drop an object, and his arm would drop to his side.  (Doc. 11-3, p. 108).  Mr. Borgen testified that those instances were "related to the nerves either being pinched or something pushing on it" and were like a light switch being turned on and off.  (Doc. 11-3, p. 108).  He stated that he was more likely to drop objects when he used his arms above shoulder height, reached for something for "more than five minutes," or strained his shoulders and neck.  (Doc. 11-3, p. 108).

Regarding his educational history, Mr. Borgen clarified that he was in special education courses in school.  (Doc. 11-3, p. 102).[14]

---

[13]  Raynaud's disease "causes some areas of the body — such as fingers and toes — to feel numb and cold in response to cold temperatures or stress.  In Raynaud's disease, smaller arteries that supply blood to the skin narrow.  This narrowing limits blood flow to affected areas" and causes the skin to turn white or blue.  *See* https://www.mayoclinic.org/diseases-conditions/raynauds-disease/symptoms-causes/syc-20363571 (last visited January 25, 2024).

[14] In closing argument, Mr. Borgen's attorney reminded the ALJ that the VE at Mr. Borgen's first hearing testified that no jobs would be available for Mr. Borgen if he missed two or more days of work per month.  (Doc. 11-3, p. 111).  The ALJ replied:  "[W]e had the vocational expert that we have.  We don't get to handpick them.  So, what most vocational experts might say is really kind of irrelevant."  (Doc. 11-3, p. 111).

***Mr. Borgen's Third Administrative Hearing***

On September 1, 2021, the ALJ held another supplemental telephone hearing to pose new hypothetical questions to the vocational expert, Ms. Broten. (Doc. 11-3, p. 45). The ALJ asked Ms. Broten to assume a hypothetical individual with the same age, education, and work experience as Mr. Borgen who was limited to light work with the following limitations:

> [T]he individual should not climb ladders, ropes[,] and scaffolds[;] [could] rarely, meaning 15% of the time or less, reach overhead bilaterally[;] [could] occasionally flex and extend the neck forward and backward and side to side[;] and [could] occasionally turn the neck side to side. The hypothetical individual should not drive as a work function and should have no exposure to hazards such as moving mechanical machinery and unprotected heights and should not operate power tools.

(Doc. 11-3, p. 55). Ms. Broten testified that the individual could not perform Mr. Borgen's past work as a truck driver but could perform light work with an SVP of two as a marker with approximately 131,229 available jobs nationally; an office helper with 10,464 available jobs nationally; and a small products assembler with approximately 9,853 available jobs nationally. (Doc. 11-3, pp. 57-58).

The ALJ then asked Ms. Broten to add to the hypothetical the limitation that the individual would be off task 5 to 10 percent of the time. (Doc. 11-3, p. 58). Ms. Broten testified that in her expert opinion "7.5% wouldn't affect your employment. Ten percent is really the cut off. So, in most cases my opinion would be that 10% or less doesn't affect employability. If it is more than that it would." (Doc. 11-3, p.

58).  Ms. Broten testified that with the added limitation, the jobs of assembler, office helper, and marker still would be available for the individual.  (Doc. 11-3, p. 59).  Ms. Broten stated that the individual also could work as a collator operator with 19,910 available jobs in the national economy.  (Doc. 11-3, p. 59).

## THE ALJ'S DECISION

The ALJ found that Mr. Borgen had not engaged in substantial gainful activity since the alleged onset date of February 22, 2017 and that he met the insured status requirement through December 31, 2022.  (Doc. 11-3, p. 16).  The ALJ determined that Mr. Borgen suffered from the severe impairments of degenerative disc disease, obesity, adjustment disorder, and generalized anxiety disorder, (Doc. 11-3, p. 16), and the non-severe impairments of hypertension, asthma, and migraines.  (Doc. 11-3, pp. 16-17).  The ALJ concluded that Mr. Borgen's learning disabilities, dyslexia, and Raynaud's syndrome were not medically-determinable impairments because the medical record did not contain "corroborating evidence establishing the presence of these impairments" as required by 20 C.F.R. § 404.1529.  (Doc. 11-3, p. 17).[15]  Based on a review of the medical evidence, the ALJ concluded that Mr. Borgen did not have an impairment or a combination of impairments that met or medically equaled

---

[15]  *See* 20 C.F.R. § 404.1529 (providing that "[n]o symptom or combination of symptoms [could] be the basis for a finding of disability, no matter how genuine the individual's complaints [might] appear to be, unless there [were] medical signs and laboratory findings demonstrating the existence of a medically determinable physical or mental impairment").

the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Doc 11-3, p. 17).

Given Mr. Borgen's severe and non-severe impairments, the ALJ evaluated Mr. Borgen's residual functional capacity.  (Doc. 11-3, p. 20).  The ALJ determined that Mr. Borgen had the RFC to perform:

> light work as defined in 20 CFR 404.1567(b) except: he should never climb ladders, ropes, and scaffolds; [could] rarely (meaning 15% of the time or less) reach overhead bilaterally; [could] occasionally flex and extend the neck forward and back, and side to side, and [could] occasionally turn the neck side to side; should not drive as a work function; should have no exposure to hazards (such as moving mechanical machinery and unprotected heights); should not operate power tools; [could] understand and remember simple as well as some detailed instructions[;] and had sufficient concentration, persistence, or pace to complete simple as well as detailed tasks . . . [,] except [he] would be off task 5-10% of the time.

(Doc 11-3, p. 20).

Based on this RFC, the ALJ concluded that Mr. Borgen could not perform his past relevant work as a truck driver.  (Doc. 11-3, p. 29).  Relying on testimony from the vocational expert, the ALJ found that other jobs existed in significant numbers in the national economy that Mr. Borgen could perform, including jobs as a marker, an officer helper, and a collator operator.  (Doc. 11-3, p. 30).  Accordingly, the ALJ determined that Mr. Borgen was not disabled under the Social Security Act.  (Doc. 11-3, p. 30).

## STANDARD OF REVIEW

The scope of review in this matter is limited. "When, as in this case, the ALJ denies benefits and the Appeals Council denies review," a district court reviews the ALJ's "'factual findings with deference'" and her "'legal conclusions with close scrutiny.'" *Riggs v. Comm'r of Soc. Sec.*, 522 Fed. Appx. 509, 510-11 (11th Cir. 2013) (quoting *Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001)).

A district court must determine whether there is substantial evidence in the record to support the ALJ's factual findings. *See* 42 U.S.C. § 405(g). "The phrase 'substantial evidence' is a 'term of art' used throughout administrative law to describe how courts are to review agency factfinding. Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains 'sufficien[t] evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, 587 U.S. __, 139 S. Ct. 1148, 1154 (2019) (quoting *T-Mobile South, LLC* v. *Roswell*, 574 U.S. ——, ——, 135 S. Ct. 808, 815, (2015), and *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)) (emphasis omitted). Substantial evidence means "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Biestek*, 139 S. Ct. at 1154 (quoting *Consolidated Edison Co.*, 305 U.S. at 229); *see also Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004) (same). In evaluating the administrative record, a district court may not "decide the facts anew, reweigh the

evidence," or substitute its judgment for that of the ALJ. *Winschel v. Comm'r of Soc. Sec. Admin.*, 631 F.3d 1176, 1178 (11th Cir. 2011) (internal quotations and citations omitted). If substantial evidence supports the ALJ's factual findings, then a district court "must affirm even if the evidence preponderates against the Commissioner's findings." *Costigan v. Comm'r, Soc. Sec. Admin.*, 603 Fed. Appx. 783, 786 (11th Cir. 2015) (citing *Crawford*, 363 F.3d at 1158-59); *see also Mitchell v. Comm'r, Soc. Sec. Admin.*, 771 F.3d 780, 782 (11th Cir. 2015) (same).

With respect to an ALJ's legal conclusions, a district court must determine whether the ALJ applied the correct legal standards. That review is *de novo*. *Lewis v. Barnhart*, 285 F.3d 1329, 1330 (11th Cir. 2002). If a district court finds an error in the ALJ's application of the law, or if the court finds that the ALJ failed to provide sufficient reasoning to demonstrate that the ALJ conducted a proper legal analysis, then the court must reverse the ALJ's decision. *Cornelius v. Sullivan*, 936 F.2d 1143, 1145-46 (11th Cir. 1991).

## DISCUSSION

Mr. Borgen argues that the ALJ improperly applied the Eleventh Circuit's pain standard and that substantial evidence does not support the ALJ's reasons for discrediting Mr. Borgen's subjective statements regarding the limiting effects of his impairments. (Doc. 15, p. 9). The Eleventh Circuit pain standard "applies when a disability claimant attempts to establish disability through his own testimony of pain

or other subjective symptoms." *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991); *Coley v. Comm'r, Soc. Sec. Admin.*, 771 Fed. Appx. 913, 917 (11th Cir. 2019). When relying upon evidence of pain to establish disability, "the claimant must satisfy two parts of a three-part test showing: (1) evidence of an underlying medical condition; and (2) either (a) objective medical evidence confirming the severity of the alleged pain; or (b) that the objectively determined medical condition can reasonably be expected to give rise to the claimed pain." *Wilson v. Barnhart*, 284 F.3d 1219, 1225 (11th Cir. 2002) (citing *Holt*, 921 F.2d at 1223). If an ALJ does not properly apply the three-part standard, reversal is appropriate. *McLain v. Comm'r, Soc. Sec. Admin.*, 676 Fed. Appx. 935, 937 (11th Cir. 2017) (citing *Holt*).

A claimant's testimony coupled with medical evidence of an impairing condition "is itself sufficient to support a finding of disability." *Holt*, 921 F.2d at 1223; *see Gombash v. Comm'r, Soc. Sec. Admin.*, 566 Fed. Appx. 857, 859 (11th Cir. 2014) ("A claimant may establish that he has a disability 'through his own testimony of pain or other subjective symptoms.'") (quoting *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005)). If an ALJ rejects a claimant's subjective testimony, the ALJ "must articulate explicit and adequate reasons for doing so." *Wilson*, 284 F.3d at 1225. The Secretary must accept a claimant's testimony as a matter of law if the ALJ inadequately discredits the testimony. *Cannon v. Bowen*, 858 F.2d 1541, 1545

(11th Cir. 1988); *Kalishek v. Comm'r, Soc. Sec. Admin.*, 470 Fed. Appx. 868, 871

(11th Cir. 2012) (citing *Cannon*).

When a claimant relies on his testimony to establish a disabling impairment,

an ALJ must follow Social Security Regulation 16-3p.  SSR 16-3p provides:

> [W]e recognize that some individuals may experience symptoms differently and may be limited by symptoms to a greater or lesser extent than other individuals with the same medical impairments, the same objective medical evidence, and the same non-medical evidence.  In considering the intensity, persistence, and limiting effects of an individual's symptoms, we examine the entire case record, including the objective medical evidence; an individual's statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by medical sources and other persons; and any other relevant evidence in the individual's case record.

SSR 16-3p, 2016 WL 1119029, at *4.  Concerning the ALJ's burden to explain the

reasons for discrediting a claimant's subjective symptoms, SSR 16-3p states:

> [I]t is not sufficient . . . to make a single, conclusory statement that "the individual's statements about his or her symptoms have been considered" or that "the statements about the individual's symptoms are (or are not) supported or consistent."  It is also not enough . . . simply to recite the factors described in the regulations for evaluating symptoms.  The determination or decision must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms.

SSR 16-3p, 2016 WL 1119029, at *10.  In evaluating a claimant's reported

symptoms, an ALJ must consider:

> (i)     [the claimant's] daily activities;

 (ii) [t]he location, duration, frequency, and intensity of [the claimant's] pain or other symptoms;

 (iii) [p]recipitating and aggravating factors;

 (iv) [t]he type, dosage, effectiveness, and side effects of any medication [the claimant] take[s] or ha[s] taken to alleviate . . . pain or other symptoms;

 (v) [t]reatment, other than medication, [the claimant] receive[s] or ha[s] received for relief of . . . pain or other symptoms;

 (vi) [a]ny measures [the claimant] use[s] or ha[s] used to relieve . . . pain or other symptoms (e.g., lying flat on your back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and

 (vii) [o]ther factors concerning [the claimant's] functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. § § 404.1529(c)(3), 416.929(c)(3); *Leiter v. Comm'r of Soc. Sec.*, 377 Fed. Appx. 944, 947 (11th Cir. 2010).

In applying the pain standard, the ALJ summarized Mr. Borgen's medical records including NP Roberts's and Dr. de Fontes's treatment records, Dr. Hughes's 2017 neurology consultation records, (Doc. 11-3, pp. 21-23); the administrative consultative medical opinions of Dr. Webster, Dr. Nisbet, and Dr. Davenport, (Doc. 11-3, p. 26-27); Dr. Haynes's testimony at the second administrative hearing, (Doc. 11-3, p. 23); Mr. Borgen's function report, (Doc. 11-3, pp. 21, 25-26); and Mr. Borgen's wife's third party function report, (Doc. 11-3, p. 21). The ALJ found that Mr. Borgen's "medically determinable impairments could reasonably be expected to

cause the alleged symptoms" but that Mr. Borgen's "statements concerning the intensity, persistence and limiting effects of these symptoms [were] not entirely consistent with the medical evidence and other evidence in the record." (Doc. 11-3, p. 21). As noted, the ALJ acknowledged Mr. Borgen's medical condition of degenerative disc disease, but she discredited Mr. Borgen's description of his pain largely because she did not find objective medical evidence that substantiated Mr. Borgen's testimony and because she found Mr. Borgen's testimony unworthy of credence.

With respect to her assessment of the objective medical evidence concerning Mr. Borgen's symptoms, the ALJ focused on Dr. Hughes's 2017 finding that Mr. Borgen's pain was non-dermatomal and Dr. Haynes's testimony concerning that finding. The ALJ stated:

> Dr. Hughes' finding that the pain was non-dermatomal is significant because non-dermatomal pain indicates that the pain exhibited does not match up with the objective results of MRIs. In this case, one would expect the severe foraminal narrowing at C4-5 would create pain in the shoulder, collarbone, and shoulder blade (for C4), and over the deltoid muscle and outer, upper arm (for C5). Instead, [Mr. Borgen complained] of pain in other areas. This demonstrates significant inconsistencies that suggest symptom exaggeration.

(Doc. 11-3, p. 22 n. 2). The statement requires some unpacking.

First, what is a dermatome? "Dermatomes are areas of [the] skin that rely on nerves that connect to [an individual's] spinal cord." https://my.clevelandclinic.org/health/body/24379-dermatomes (last visited Mar. 1,

2024).[16]  Dr. Haynes, the neurologist who the ALJ asked to provide expert testimony, stated that the "human body [is] striped like a zebra, except you can't see the stripes. Each stripe would be a dermatome."  (Doc. 11-3, pp. 79-80).  "Nerves in the cervical section of [the] spine connect to dermatomes in [an individual's] head, neck, shoulders, arms and hands."  https://my.clevelandclinic.org/health/body/24379-dermatomes (last visited Mar. 1, 2024).  "[A]ny condition affecting [the] spinal cord or spinal nerves can cause symptoms that affect dermatomes.  In these cases, the damage is very localized, but the effects are widespread depending on the dermatomes affected."  https://my.clevelandclinic.org/health/body/24379-dermatomes (last visited Mar. 1, 2024).  "Dermatomes are important because they can help to assess and diagnose a variety of conditions.  For instance, symptoms that occur along a specific dermatome may indicate a problem with a specific nerve root in the spine."  https://www.healthline.com/health/dermatome#importance (last visited Mar. 1, 2024).  Dr. Hughes used a dermatomal map when he examined Mr. Borgen.  (Doc. 11-10, p. 5).  A dermatomal map is attached as Appendix A to this opinion.

---

[16] *See also https://www.ncbi.nlm.nih.gov/books/NBK535401/figure/article-29335.image.f1/* (last visited Mar. 1, 2024) ("A dermatome is an area of skin receiving sensory innervation from a single spinal nerve dorsal root.").

A medical notation of non-dermatomal pain indicates that a patient identifies pain in locations that do not map to a specific nerve root in the spine.  Dr. Haynes stated that non-dermatomal pain is "pain all over the place and it doesn't match up with any of the nerve roots."  (Doc. 11-3, p. 80).  Dr. Haynes added that non-dermatomal pain is "subjective" and "radiates out some way in an unphysiologic manner from [] whatever was going on in the spine or it might be a condition in the extremity.  It could be a vascular blood vessel . . . a venous thrombosis . . . a tumor somewhere.  There's lots of possibilities."  (Doc. 11-3, p. 80).

Given this description of dermatomes and non-dermatomal pain, the ALJ's statement that "non-dermatomal pain indicates that the pain exhibited does not match up with the objective results of MRIs" is generally accurate.  The ALJ's subsequent statement that "[i]n this case, one would expect the severe foraminal narrowing at C4-5 would create pain in the shoulder, collarbone, and shoulder blade (for C4), and over the deltoid muscle and outer, upper arm (for C5)" aligns fairly well with the dermatomal map attached to this opinion and with the Keegan and Garrett map of 1948, though both maps illustrate that the C5 dermatome extends down the interior of the forearm to a point just above the wrist. https://www.ncbi.nlm.nih.gov/books/NBK535401/figure/article-29335.image.f1/?report=objectonly (last visited May 21, 2024).   Importantly though, the Court has not located medical evidence in the administrative record that

confirms the ALJ's stated expectation or this Court's lay observation of dermatomal maps.

Dr. Haynes did not identify the type of dermatomal pain that might be associated with severe foraminal narrowing at C4-5. (Doc. 11-3, p. p. 22 n. 2). When Mr. Borgen's attorney asked Dr. Haynes if the record showed that Mr. Borgen had complained of pain in areas "that match up with dermatomal pain at the C4-5 level," Dr. Haynes replied, "[w]ell, the neurosurgeon is smart enough to look at that MRI and say maybe we'd better look here and look there and go—and that's what he did. He measured strength. He measured reflexes, measured sensation. Did not see anything that was correlating. And ditto with Dr. Webster." (Doc. 11-3, pp. 99-100). The Court has not located evidence in the record that indicates the type of dermatomal pain one would expect to find for Mr. Borgen's MRI results of "multilevel spondylitic change" with narrowing of disc spaces between C2 and C6; mild central canal stenosis at C4-5 and C5-6, with greater stenosis of the neural foramina; "severe narrowing of the right-sided neural foramina at C4-5 and C5-6"; and "moderate left foraminal stenosis at level C4-5." (Doc. 11-11, p. 88). Thus, the record does not contain substantial evidence to support the ALJ's assertion that Mr.

Borgen's MRI results would be expected to produce dermatomal pain only in his shoulder, collarbone, shoulder blade, deltoid muscle, and outer, upper arm.[17]

Moreover, though Mr. Borgen complained of pain in areas other than his shoulder and upper arm, his medical records contain evidence of shoulder pain and weakness dating to early 2017.  (Doc. 11-10, pp. 4, 13, 121; Doc. 11-10, p. 51 (record of telemedicine visit noting Mr. Borgen's report of limited range of motion in his right shoulder and "struggl[e]" to move his right arm); Doc. 11-11, pp. 28, 88; Doc. 11-12, p. 30).  One of Mr. Borgen's chief complaints to Dr. Webster was bilateral shoulder pain.  (Doc. 11-10, p. 95).  Dr. Webster reported that the shoulder pain was diffuse and "radiate[d] over the deltoid muscles bilaterally and into the scapulas." (Doc. 11-10, pp. 95-96).  Dr. Webster stated that MRIs of Mr. Borgen's shoulders were normal and that Mr. Borgen's doctors thought that his shoulder pain transferred

---

[17] Dr. Haynes testified that Mr. Borgen had "normal imaging" and that Mr. Borgen did not "have physical abnormalities that correlate[d] with his symptoms."  (Doc. 11-3, p. 93).  Dr. Haynes reasoned that because patients with foraminal narrowing often are asymptomatic, foraminal narrowing was "normal" and was not indicative of pain or functional limitations.  (Doc. 11-3, pp. 84, 97, 99).  The ALJ did not seem to credit Dr. Haynes's opinions in this regard because the ALJ found that Mr. Borgen's "medically determinable impairments could reasonably be expected to cause the alleged symptoms."  (Doc. 11-3, p. 21).

Dr. Haynes also stated that Mr. Borgen's severe cervical foraminal narrowing was worse on the right side, but that Mr. Borgen did not have symptoms on his right side.  (Doc. 11-3, p. 84).  Dr. Haynes appears to have overlooked information available to him in the administrative record.  Mr. Borgen's medical records, including Dr. Hughes's treatment note, show that Mr. Borgen complained of pain and limitations in his right shoulder, (Doc. 11-10, pp. 51, 95, 111, 121), and in both his right and left arms, (Doc. 11-3, p. 140; Doc. 11-8, pp. 89-90; Doc. 11-10, pp. 4, 51, 111, 121; Doc. 11-11, p. 88; Doc. 11-12, pp. 36-38, 41, 45).

from his neck.   (Doc. 11-10, pp. 95-96).[18]   Mr. Borgen testified at the second administrative hearing that it was "mainly [his] shoulders and arms that [were] in pain."   (Doc. 11-3, p. 106).   Thus, Mr. Borgen's medical records contain evidence of shoulder pain that is consistent with his diagnosis of severe foraminal narrowing at C4-5.   *See* 20 C.F.R. § § 404.1529(c)(3)(ii).[19]

The ALJ concluded that because Mr. Borgen complained of pain in areas other than his shoulders and upper arms, his complaints "demonstrated significant inconsistencies that suggest symptom exaggeration."   (Doc. 11-3, p. 22, n. 2).   The ALJ also concluded that "the record did not support the presence of neuroanatomic pain because the claimant's neck pain was non-dermatomal."   (Doc. 11-3, p. 25).   As discussed, Mr. Borgen's reports of shoulder and upper arm pain to treating and consulting physicians appear, per dermatomal maps, is consistent with the dermatomes associated with the cervical findings from his MRI, but even if every report in Mr. Borgen's medical records concerned non-dermatomal pain, there is not

---

[18] Dr. Webster reported that Mr. Borgen had a normal neuromuscular exam the day she saw him, though "[p]inprick was decreased throughout his whole body except for the flexor portion of the forearms" and that she believed, despite the normal results, that postural restrictions were necessary for Mr. Borgen because his medical records indicated to her that he had "some significant neck problems on x-rays and MRIs" that "did not show up on any exam" she performed. (Doc. 11-10, p. 100).

[19] Another chief complaint was "[n]umbness and tingling in both hands."   (Doc. 11-10, p. 95). Numbness and tingling in the hands is a symptom of cervical foraminal stenosis. https://www.webmd.com/back-pain/what-is-neural-foraminal-stenosis (last visited Mar. 5, 2024); https://my.clevelandclinic.org/health/diseases/24856-foraminal-stenosis (last visited Mar. 5, 2024)..

substantial evidence to support the ALJ's conclusion that non-dermatomal pain suggests symptom exaggeration.[20]   As Mr. Borgen argued, "no medical opinion of record states that non-dermatomal MRI findings discredit complaints of pain." (Doc. 15, p. 10).   Mr. Borgen's medical records contain chronic pain diagnoses dating to 2015 from several treating physicians and nurse practitioners.   (Doc. 11-10, p. 56; Doc. 11-10, p. 106; Doc. 11-10, pp. 120, 122; Doc. 11-12, p. 3; Doc. 11-12, pp. 45, 48).   The levels of pain medication multiple treating physicians and nurse practitioners prescribed for Mr. Borgen over several years are consistent with severe pain.  *See* 20 C.F.R. § § 404.1529(c)(3)(iv).   When Dr. Webster examined Mr. Borgen at the request of the SSA, she found "no poor effort, inconsistencies, or pain behavior."   (Doc. 11-10, p. 97).   She stated that Mr. Borgen's subjective report and her objective findings were consistent.   (Doc. 11-10, p. 98).[21]

---

[20] In his brief, Mr. Borgen cited a study in which researchers found that pain did not necessarily follow a specific dermatome.  (Doc. 15, p. 10 n. 7) (citing Murphy, Hurwitz, Gerrard, Clary, *Pain patterns and descriptions in patients with radicular pain: does the pain necessarily follow a specific dermatome?*, available at https://pubmed.ncbi.nlm.nih.gov/19772560/).   In that study, researchers assessed 226 nerve roots in 169 patients and found that "pain related to cervical nerve roots was non-dermatomal in over two-thirds (69.7% ) cases."  For the C4 nerve root, 40 percent of the patients had non-dermatomal pain, and for the SI nerve root, about 35 percent of the patients had non-dermatomal pain.  The study concluded that in "most cases[,] nerve root pain should not be expected to follow along a specific dermatome, and a dermatomal distribution of pain is not a useful historical factor in the diagnosis of radicular pain. The possible exception to this is the S1 nerve root, in which the pain does commonly follow the S1 dermatome."   *See* https://pubmed.ncbi.nlm.nih.gov/19772560/ (last visited Jan. 28, 2024).

[21] Were evidence developed regarding the disabling effects of non-dermatomal pain, the evidence likely would show that non-dermatomal pain is not uncommon in individuals diagnosed with chronic pain.  In one of several articles the National Library of Medicine has published concerning "nondermatomal somatosensory deficits," the authors wrote:  "NDSDs may occur in the absence of biomedical pathology or coexist with structural musculoskeletal or nervous system

The evidence that Mr. Borgen's non-dermatomal pain was real and required treatment helps inform Dr. Hughes's advice to Mr. Borgen concerning neck surgery. As noted, Dr. Hughes discussed with Mr. Borgen the surgical options of a "C4-5 and C5-6 anterior cervical discectomy and fusion" or a right "C4-5, C5-6 laminotomy and foraminotomy" and explained the risks of both procedures.  (Doc. 11-10, pp. 5-6).  Dr. Hughes discussed the "potential outcomes after surgery," including "immediate relief due to treatment of a mechanical distortion of the nerve root without injury; relief in a timeframe of weeks to months due to resolution of swelling

---

abnormalities.  They appear to be associated with psychological factors and a poor prognosis for response to treatment and return to work.  Recent brain imaging studies provide a basis for understanding NDSD pathophysiology.  "Nondermatomal somatosensory deficits: overview of unexplainable negative sensory phenomena in chronic pain patients," https://pubmed.ncbi.nlm.nih.gov/20657277/ (2010) (last visited Mar. 1, 2024); *see also* "On the nature of nondermatomal somatosensory deficits," https://pubmed.ncbi.nlm.nih.gov/20664332/ (2011) (last visited Mar. 1, 2024) (stating that "[n]ondermatomal somatosensory deficits (NDSDs) not conforming to the distribution of peripheral nerves or dermatomes, and often present after a minor injury or with no known inciting event, have long been associated with 'hysteria.' . . . The prevalence of NDSDs varies between 25% and 50% in samples of chronic pain populations. . . . Illustrative case reports show the remarkable NDSD phenomenology, variability, and reversibility. NDSDs represent intensely dynamic phenomena that are likely associated with supraspinal mechanisms.  Recent functional imaging findings show significant alterations in brain activation patterns in these patients.  Similar but spatially and temporally restricted phenomena have been shown in experimental studies with healthy controls and pain patients.  NDSDs are associated with certain demographic variables, and possibly psychological factors seem to constitute a poor prognostic sign for response to treatment and return to work and can coexist with structural musculoskeletal or nervous system abnormalities.");  *see* Doc. 11-10, p. 95 (stating that Mr. Borgen had a neck fracture at age 20 and "ha[d] had pain since and decreased strength and coordination in his hands").  The psychological component of non-dermatomal pain aligns with Dr. Haynes's testimony that Mr. Borgen "had, of course, psychologically, there would be the definition of symptom magnification."  (Doc. 11-3, p. 81).  As noted, the ALJ recognized that Mr. Borgen suffered from the severe impairment of generalized anxiety disorder.  (Doc. 11-3, p. 16; *see* Doc. 11-10, pp. 116-17) (stating that Mr. Borgen had a history of "get[ting] waves of panic that he cannot function" and stating that the waves of anxiety had become "more frequent").

due to minor injury to the nerve involved; relief in a timeframe of months to years due to regrowth of a nerve injured by mechanical distortion to the point that neurons need[ed] to re-extend from the point of injury where they were disrupted; and no relief whatsoever due to a nerve injury too severe for the nerve to overcome." (Doc. 11-10, p. 6). Dr. Hughes concluded: "In this case, there is no good indication for such surgeries -- as I discussed with the patient. Counseled regarding radiculopathy signs and symptoms." (Doc. 11-10, p. 6). Simply stated, Dr. Hughes advised Mr. Borgen that surgery might relieve his pain, but it might not, and surgery presented a host of serious risks including "heart attack, anoxic brain injury, stroke, and death" and the potential injury to adjacent spinal structures that might require additional surgery later. (Doc. 11-10, p. 6).

From this discussion that included medical terminology like "cervical discectomy and fusion," "laminotomy and foraminotomy," "treatment of a mechanical distortion of the nerve root," and "anoxic brain injury," Mr. Borgen appears to have concluded that "he need[ed] a full cervical spine fusion"; that the surgery might help his pain but could cause him to "lose all mobility in his neck"; and that he should "try every possible intervention prior to this surgery," including physical therapy and acupuncture; that is what he reported to NP Roberts when he

saw her two weeks after his visit with Dr. Hughes.  (Doc. 11-10, p. 16).[22]  Though Mr. Borgen may have misunderstood or mistakenly reported the details of his conversation with Dr. Hughes, Mr. Borgen conveyed to NP Roberts the point that Dr. Hughes tried to impress upon Mr. Borgen:  surgery was not a good option for him, and he needed to seek pain relief by means other than surgery.

The ALJ expressed concern about Mr. Borgen's inaccurate report to NP Roberts, stating:

> Contrary to Dr. Hughes['s] conclusion that there was "no good indication" for the potential surgeries, . . . in a follow-up on a surgical consultation with [NP] Roberts on April 18, [Mr. Borgen] instead reported that Dr. Hughes told him that he needed a full cervical spine fusion.  It [was] concerning that [Mr. Borgen] would so grossly mis-report Dr. Hughes'[s] conclusion.

(Doc. 11-3, p. 22) (internal record cite omitted).[23]  The record suggests that the ALJ's concern about Mr. Borgen's "misreport" significantly impacted the administrative

---

[22] It is not clear whether, after she referred Mr. Borgen to Dr. Hughes, NP Roberts followed up with Dr. Hughes or requested a copy of his assessment of Mr. Borgen.  When Dr. de Fontes assumed Mr. Borgen's care from NP Roberts, he had access to Dr. Hughes's report and summarized the report in Mr. Borgen's April 7, 2021 medical record.  (Doc. 11-11, p. 150).

[23] The ALJ continued:

> At an office visit with Ms. Roberts on October 25, 2017, the claimant reported complete loss of function in his hand at times, with the specific hand not identified. Ms. Roberts conducted a limited musculoskeletal exam, and noted only that the claimant had "some" movement in his left arm/hand, and that his hand grasps were "weaker."  Ms. Roberts nonetheless noted the claimant was in urgent need of a cervical fusion, despite neurosurgical specialist Dr. Hughes finding no indication surgery was warranted.

proceedings.  In Mr. Borgen's first administrative hearing, the ALJ took the unusual step of posing hypothetical questions to the vocational expert about work available to Mr. Borgen before obtaining Mr. Borgen's testimony regarding his symptoms and pain.  (Doc. 11-3, pp. 123-137 (ALJ's examination of Mr. Borgen regarding past work and of VE regarding jobs available to Mr. Borgen under a series of hypotheticals); Doc. 11-3, pp. 137-44) (ALJ examining Mr. Borgen about pain, treatment, and activities of daily living)).  Ordinarily, an ALJ receives testimony from a claimant before presenting hypothetical questions to a VE to determine whether there are significant numbers of jobs in the economy that the claimant can

---

(Doc. 11-3, p. 22).  The ALJ's description of NP Roberts's October 2017 record is not accurate.  NP Roberts wrote that Mr. Borgen had "long standing cervical disc degeneration" and "[s]aw Neurosurgery at Kaiser last year and was told that fusion is the only option.  He had seen neurosurgery years ago and fusion was the only option at that time too."  (Doc. 11-10, p. 13).  NP Roberts stated that Mr. Borgen had "put off surgery" and tried "to deal with [his] pain," but the pain was "getting too much," and he had lost function in his arm.  (Doc. 11-10, p. 13).  Though NP Roberts did not specify which arm had lost function, she diagnosed "[r]adicular pain of upper left extremity," (Doc. 11-10, p. 13), so it is fair to infer that the pain and loss of function that Mr. Borgen described was associated with his left arm.  NP Roberts noted that Mr. Borgen reported that he had been working with a chainsaw, and he had dropped the saw and almost injured himself.  Mr. Borgen "report[ed] sometimes the arm work[ed] and then it [was] like a short circuit" and Mr. Borgen would lose function.  (Doc. 11-10, p. 13).  Mr. Borgen added that the problem was becoming more frequent, so he was willing to consider surgery, but because he did not have insurance, surgery was not an option.  (Doc. 11-10, p. 13).  When she examined Mr. Borgen, NP Roberts found that he had reduced grip strength in both hands and limited movement in his left hand and arm.  (Doc. 11-10, p. 13).  Based on Mr. Borgen's reports and her limited physical examination of Mr. Borgen during the October 2017 visit, NP Roberts wrote that Mr. Borgen was "rapidly losing function," that "[h]is best option [was] for fusion," and that if the situation became urgent and he could not wait for surgery, he would have to buy insurance or pay for surgery out of pocket.  (Doc. 11-10, p. 13).  NP Roberts had consulted the financial specialists at MC Primary Care, and they had recommended that Mr. Borgen apply for disability benefits from the state.  (Doc. 11-10, p. 13).  Thus, given her findings that Mr. Borgen's symptoms had become worse, NP Roberts's notes concern her efforts to identify financial options for Mr. Borgen should he reach a point at which he urgently needed surgery.

perform, given the claimant's limitations, because a VE's opinion does not constitute substantial evidence regarding the availability of other work unless an ALJ includes in hypothetical questions all of the claimant's impairments.  An ALJ may omit from hypothetical questions only findings "'that the ALJ [] properly rejected as unsupported.'"  *Washington v. Soc. Sec. Admin., Com'r*, 503 Fed. Appx. 881, 883 (11th Cir. 2013) (quoting *Crawford*, 363 F.3d at 116; *see also McSwain v. Bowen*, 814 F.2d 617, 620 n. 1 (11th Cir. 1987) (holding that ALJ did not err in omitting limitations regarding the claimant's alleged depression from hypothetical posed to VE because the claimant "did not present substantial medical evidence of depression, and he admitted at his hearing that his episodic events of depression were generally in response to difficult situations, such as not being able to work"); *Allen v. Barnhart*, 174 Fed. Appx. 497, 499 (11th Cir. 2006) (per curiam) (stating that "although the Administrative Law Judge concluded that Allen had sleep apnea and pain, the Administrative Law Judge discredited Allen's testimony to the extent that Allen testified that those impairments produced greater limitations than those posed in the hypothetical question. The conclusion of the Administrative Law Judge is supported by substantial evidence, both documentary and Allen's own testimony regarding his daily activities.").  For the ALJ to have framed hypothetical questions without first hearing Mr. Borgen's description of his pain and functional limitations

and determining how much of that testimony to credit, the ALJ must have concluded that she would credit none of that testimony.

Remarks during Mr. Borgen's second administrative hearing similarly illustrate the extent to which Mr. Borgen's inaccurate description of Dr. Hughes's advice regarding surgical options impacted the ALJ's ultimate conclusions.  During that hearing, as Mr. Borgen's attorney was questioning him about his symptoms, Mr. Borgen stated that he was a "little confused" by what Dr. Haynes said earlier in the hearing about Dr. Hughes's advice "because [Dr. Hughes] told [him] that total fusion --." (Doc. 11-3, p. 102).  The ALJ stopped Mr. Borgen, instructed him that she did not want him "to argue with what the medical expert said," and stated that she "took full testimony" from Mr. Borgen one year earlier during the first hearing and was not going to "reinvent the wheel."  (Doc. 11-3, p. 103).[24]  Mr. Borgen's attorney urged the ALJ to allow Mr. Borgen to explain "what he heard [Dr. Hughes] say" and "what he understood [Dr. Hughes] to tell him."  (Doc. 11-3, p. 103).  The ALJ stated that what Mr. Borgen "believe[d] he heard from [Dr. Hughes did not] change what [was] in the objective file" and was "not really terribly relevant" to Mr. Borgen's case.  (Doc. 11-3, p. 104).

---

[24] During the first administrative hearing, Mr. Borgen was not asked about and did not testify regarding his consultation with Dr. Hughes.

The record contradicts this assertion.  The record indicates that much of the ALJ's analysis rests on her conclusion that Mr. Borgen exaggerated his reports of pain and misreported to NP Roberts Dr. Hughes's advice that he was not a good candidate for cervical surgery.  The ALJ cited Mr. Borgen's inaccurate report of Dr. Hughes's advice four times in her opinion.  (Doc. 11-3, pp. 22, 26-27).  Had the ALJ considered the testimony that Mr. Borgen tried to provide regarding his understanding of his conversation with Dr. Hughes, the ALJ might have been less concerned with Mr. Borgen's veracity.  The ALJ's conclusion that Mr. Borgen exaggerated his pain and grossly misreported Dr. Hughes's advice suggests that the ALJ assessed Mr. Borgen's credibility, an assessment that the Commissioner eliminated from the administrative process when the Commissioner superseded SSR 96-7p with SSR 16-3p.  The Commissioner explained that in adopting SSR 16-3p, the Social Security Administration was "eliminating the use of the term 'credibility' from our sub-regulatory policy, as our regulations do not use this term. In doing so, we clarify that subjective symptom evaluation is not an examination of an individual's character."  SSR 16-3p, 2017 WL 5180304, *2 (Oct. 25, 2017).  The Commissioner instructed ALJs to "consider all of the evidence in an individual's record when they evaluate the intensity and persistence of symptoms after they find that the individual has a medically determinable impairment(s) that could reasonably be expected to produce those symptoms."  SSR 16-3p, 2017 WL 5180304, *2.

Even if the ALJ had properly discounted NP Roberts's treatment records because of Mr. Borgen's misreport of Dr. Hughes's advice, the ALJ would not have had a similar basis to discount Dr. de Fontes's findings because Dr. de Fontes reviewed and considered Dr. Hughes's record of his consultation with Mr. Borgen. Before Dr. de Fontes reviewed Dr. Hughes's record, during Dr. de Fontes's first visit with Mr. Borgen after he assumed Mr. Borgen's care from NP Roberts, Dr. de Fontes examined Mr. Borgen and found that Mr. Borgen had limited range of motion in his neck "secondary [to] apprehension and to stiffness/spasms." (Doc. 11-10, p. 122). This finding is notable because it is consistent with Dr. Hughes's finding that Mr. Borgen's pain was "largely associated with guarding, i.e. 'locking up.'" (Doc. 11-10, p. 5).[25] Dr. de Fontes's assessment included chronic pain syndrome and cervical disc degeneration which, per MRIs, was "worse at C4-5, C5-6" where Mr. Borgen had "marked foraminal stenosis;" Dr. de Fontes prescribed gabapentin and cyclobenzaprine for muscle spasms. (Doc. 11-10, pp. 111, 122). Dr. de Fontes described Mr. Borgen's symptoms as persistent pain in his neck and shoulders,

---

[25]  The Court found no evidence that suggests that the ALJ considered what guarding is and how it affects an individual's neck. The ALJ did not explore the topic with Dr. Haynes. Evidence concerning muscle spasms and guarding in the neck might shed light on Mr. Borgen's pain. *See, e.g., https://advanceaquaticpt.com/neck-pain-radicular-pain/* (last visited Mar. 5, 2024); *https://drmartinschmaltz.com/muscle-guarding-the-pain-cycle#:~:text=MUSCLE%20GUARDING%3A%20The%20same%20nerves,to%20splint%20the%20injured%20area.* (last visited Mar. 5, 2024).

weakness in his arms and hands with greater weakness on his right side, and rigid muscle spasms.  (Doc. 11-10, p. 111; Doc. 11-11, p. 142).

As part of his final visit with Mr. Borgen, in anticipation of Mr. Borgen's move to Alabama, Dr. de Fontes reviewed and considered Dr. Hughes's "extensive discussion [with Mr. Borgen] regarding the nature of any surgery that they might pursue;" recognized that Dr. Hughes, at the time of his consultation with Mr. Borgen in April 2017, "did not think surgery was indicated;" and noted that Dr. Hughes "believed that [Mr. Borgen's] pain symptoms were possibly more related to left arm pathology and/or guarding."  (Doc. 11-11, p. 150).  Dr. de Fontes described the results of Mr. Borgen's 2017 MRI; noted, as he had in past records, Mr. Borgen's cervical degenerative disease and episodes of arm numbness and temporary loss of function; and maintained his diagnoses of cervical disc degeneration and chronic pain syndrome.  (Doc. 11-11, pp. 151-52; *see also* Doc. 11-10, pp. 121-22).  Dr. de Fontes wrote that Mr. Borgen "had attended [physical therapy] without significant reduction in overall symptoms or level of function."  (Doc. 11-11, p. 150).  Dr. de Fontes explained that he had worked with Mr. Borgen to decrease Mr. Borgen's opioid usage, (Doc. 11-10, pp. 132-33, 152), not because Mr. Borgen was misusing opioids but because the safe maximum dosage had changed.  (Doc. 11-10, p. 132).  Dr. de Fontes stated that there was "no history of overuse or misuse and reviewing

PDMP [was] consistent with his prescriptions received here over many years." (Doc. 11-11, p. 152).

None of the providers Mr. Borgen saw in Alabama disagreed with the diagnoses Mr. Borgen received from NP Roberts, Dr. Hughes, or Dr. de Fontes. (*See* pp. 18-20 above).[26]

For the reasons discussed, the Court will remand this case for additional proceedings consistent with this opinion. The Court anticipates that the ALJ will hold a new administrative hearing in which the ALJ will hear testimony from Mr. Borgen before posing hypotheticals to the VE, and the ALJ will allow testimony concerning Mr. Borgen's understanding of Dr. Hughes's advice regarding surgical options.

On remand, in addition to considering Mr. Borgen's pain testimony regarding his severe impairment of degenerative disc disease, the ALJ also should consider evidence regarding pain associated with Mr. Borgen's migraine headaches. As noted, the ALJ found that Mr. Borgen's headaches were a non-severe impairment, and she stated, at stage two, that she "considered any effect that [Mr. Borgen's] non-severe impairments would have on his ability to function." (Doc. 11-3, p. 17). The

---

[26] The Court notes that in his intake forms with his new provider in Alabama, Mr. Borgen reported daily sleep issues. He also reported fatigue and trouble concentrating several days in a 14-day period. (Doc. 11-12, p. 9). In addition, Mr. Borgen was unwilling to drive because his medication made him feel drowsy and because he worried that he might have an episode of sudden numbness and lose his grip on the steering wheel while driving. (Doc. 11-3, pp. 139-40; Doc. 11-8, pp. 31, 41).

ALJ did not mention Mr. Borgen's migraine symptoms and any limitations caused by them at step four, so the Court cannot tell how the ALJ considered Mr. Borgen's migraine pain and symptoms in combination with his chronic pain associated with cervical degenerative disease.  *See* 20 C.F.R. §§ 404.1545(e), 416.945(e); SSR 96-8p at *5.[27]  Though the ALJ does not have to "refer to every piece of evidence in [her] decision," *Mitchell v. Comm'r, Soc. Sec. Admin.*, 771 F.3d 780, 782 (11th Cir. 2014) (internal quotations and citations omitted), in determining a claimant's RFC, an ALJ must consider the claimant's impairments in combination and must clearly articulate reasons for discrediting a claimant's reported pain and symptoms.  *See* SSR 16-3p; *Schink v. Comm'r of Soc. Sec.*, 935 F.3d 1245, 1269 (11th Cir. 2019) (stating that in determining a claimant's RFC, an ALJ must evaluate that "claimant's medical condition taken as a whole"); *Walker v. Bowen*, 826 F.2d 996, 1001 (11th

---

[27] For example, in October 2017, Mr. Borgen reported to NP Roberts that he was having migraine headaches three times per month.  (Doc. 11-10, p. 13).  In November 2018, Mr. Borgen saw NP Roberts and complained of migraines.  (Doc. 11-10, pp. 116-17).  MNP Roberts noted that Mr. Borgen's migraines had become more frequent and severe over several months and indicated that Mr. Borgen saw bright lights before a migraine began and needed to lie down in a dark room until a migraine resolved.  (Doc. 11-10, p. 116).  Mr. Borgen told NP Roberts that his most recent migraine had taken two days to resolve.  (Doc. 11-10, p. 116).  NP Roberts prescribed sumatriptan because Mr. Borgen reported that over-the-counter medication was no longer providing relief. (Doc. 11-10, pp. 116-17).  Mr. Borgen reported to Dr. Webster three to seven migraines a week with "visual scotoma" before and nausea after a migraine, with no relief taking Imitrex.  (Doc. 11-10, p. 96).  In his March 2018 function report, Mr. Borgen indicated that his migraines required him to stay in a dark room sometimes for two to three days.  (Doc. 11-8, p. 28).  During the second administrative hearing in May 2021, Mr. Borgen reported that he suffered from migraine headaches three or four times a week that lasted between an hour-and-a-half to five hours.  (Doc. 11-3, p. 105).

Cir. 2010) ("It is clear that in this case the ALJ did not consider the combination of Walker's impairments before determining her residual functional capacity.  The ALJ made specific reference only to Walker's left ankle and obesity.  The ALJ's findings do not mention Walker's arthralgias in the right knee, phlebitis in the right arm, hypertension, gastrointestinal problems, or asthma, except to the extent that these 'subjectiv[e] complain[t]s do not establish disabling pain.'").

## CONCLUSION

Because the ALJ did not properly apply the pain standard, and substantial evidence did not support her pain standard findings, the Court reverses the decision of the Commissioner and remands this case for further proceedings consistent with this opinion.

**DONE** and **ORDERED** this May 22, 2024.

**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE